## HARRINGTON vs. SMITH.

1. CONSTRUCTION OF STATUTES: *Various rules considered and applied.*

2. COMMISSIONERS OF SCHOOL AND UNIVERSITY LANDS: (4) *To issue duplicate certificates upon all sales.* R. S., ch. 28, sec. 42. (16) *Their compensation under sec. 22, ch. 537, Laws of* 1865.

1. The true rule for the construction of statutes is to look to the whole and every part of the statute, and the apparent intention derived from the whole, to the subject matter, to the effects and consequences, and to the reason and spirit of the law; and thus to ascertain the *true* meaning of the legislature, though the meaning so ascertained may sometimes conflict with the literal sense of the words.

2. In thus viewing a statute, every part in connection with the whole, it must likewise be so construed as to make all parts harmonize if practicable, and give a sensible and intelligible effect to each, and not to place one portion in antagonism to another.

3. General words in a statute must receive a general construction unless there be something in it to restrain them, or if there be no express exception.

4. The word *all* or the words *all moneys*, in section 42, ch. 28, R. S., are general, and as the statute contains no restraining words or express exception, they must receive a general construction. In connection with the provisions of section 43 of the same chapter, they must be construed as requiring the issue of duplicate certificates of sale on *all* sales of lands by the commissioners of the school and university lands, whether such sales be for *cash* or upon credit.

5. The amendment or repeal of a section or portion of a statute, does not prevent a resort to the part amended or repealed, in interpreting so much of the statute as remains in force. For the purpose of aiding in ascertaining the true construction and meaning of other parts of the statute, it may be considered as if no amendment or repeal had taken place.

6. A statute which requires commissioners empowered to sell public lands to give a certificate of sale upon payment therefor in cash, is valid, though the form of such certificate or its contents be not prescribed by the statute. It is for the commissioners in such case to prepare a certificate which shall comply with the requirements of the law.

7. Statutes are not to be set aside nor their requirements disregarded by the courts, because they may command that which may to others seem idle and useless. The construction of the law belongs to the

| | |
|---|---|
| 28 | 43 |
| 74 | 135 |
| 28 | 43 |
| 81 | 433 |
| 81 | 515 |
| 28 | 43 |
| 83 | 164 |
| 28 | 43 |
| 88 | 3 |
| 88 | 572 |
| 28 | 43 |
| J91 | 318 |
| 91 | 377 |
| 28 | 43 |
| 94 | 209 |
| 95 | 322 |
| 28 | 43 |
| 99 | 128 |
| 28 | 43 |
| 103 | 659 |
| 28 | 43 |
| 107 | 425 |
| 28 | 43 |
| ₁113 | ₁406 |
| 28 | 43 |
| ₁114 | ₁178 |
| 28 | 43 |
| 115 | ₁407 |
| 115 | ₁474 |
| 116 | ₁212 |

Harrington vs. Smith.

court, but not its policy, and reasons of that kind cannot be looked to for the purpose of disregarding the plain requirements of a constitutional enactment.

8. A statute ought upon the whole to be so construed, that, *if possible*, no *clause*, *sentence* or *word* shall be *superfluous*, void or *insignificant*.

9. Every clause and word of a statute shall be presumed to have been intended to have some force and effect.

10. Where a known statute has been re-enacted in terms, its known interpretation will be presumed to have been also adopted by the legislature.

11. Long and uninterrupted practice under a statute, especially by the officers whose duty it was to execute it, is good evidence of its construction, and such practical construction will be adhered to even though, were it *res integra*, it might be difficult to maintain it.

12. Great weight and consideration are due to the uniform practical construction which a statute has received under the advice and direction of the highest law officers of the state, the attorneys-general, and which has long been a rule of practice in that branch of the executive department of the government to which the statute pertains.

13. A report of the judiciary committee of the senate, to whom the question was referred by resolution of that body, is proper to be considered as part of the practical exposition which the statute has received, and as showing the sense and meaning of the law as understood by the legislature itself.

14. The courts cannot imagine an intent, and bind the letter of the act to it, nor indulge in the license of striking out and inserting and remodeling with the view of making the letter express an intent which the statute in its native form does not evidence.

15. Every construction is vicious which requires great changes in the letter of the statute.

16. Section 22 of chapter 537, Laws of 1865, is general in its operation, and includes every certificate and every patent issued for lands sold by the state, and is not limited to certificates and patents upon sales of swamp lands only.

APPEAL from the Circuit Court for *Dane* County.

Chapter 28, R. S. 1858, provides that all school and university lands, not already sold at the time of the passage of the act, shall from time to time be offered for sale at public auction (sec. 19); that all of such lands which have once been offered at public sale and remain unsold, and all forfeited school and university lands, after being re-offered at public sale and re-

maining unsold, shall be subject to private sale on certain specified terms (sec. 32); that persons seeking to purchase any such lands at private sale shall produce to the secretary of state an application therefor in writing, etc. (sec. 35); that he shall also file a certain affidavit (sec. 36); that upon the receipt of such application and affidavit the secretary of state shall give to the applicant a memorandum stating such application and describing the tract or lot of land specified therein, and stating the price at which it may be sold, and the amount to be paid at the time of sale (sec. 37); that upon the production of such memorandum to the state treasurer, and the payment to him of "such sum as shall be required to be paid upon the sale for the land purchased, and also upon the payment of such sum as shall be required to be paid upon the sale of any of said lands at public auction, the said treasurer shall give a receipt therefor to such applicant or purchaser, and shall make out, execute and deliver to such person *a duplicate certificate of sale,* in which he shall certify the description of the land sold, the sum paid, *and the amount remaining due thereon, and the times, the places, and terms of payment,* and that if it shall be duly discharged, the purchaser, or his assignees or other legal representatives, shall be entitled to a patent for such land; the original and the duplicate certificate shall be properly numbered and signed by the treasurer, and countersigned by the secretary of state, and the original shall be filed and recorded in the office of the said treasurer; and no certificate, unless the duplicate be so countersigned, shall be valid in law" (sec. 38).    It is also provided by sec. 39, that said certificate "shall further set forth that in case of the non-payment into the state treasury of the purchase money as it shall become due, or of the interest due thereon, by the first day of January or on or before the fifth day of March thereafter, in each and every year, by the purchaser or purchasers, or by any person claiming under him or them, then the said certificate, from the time of such failure, shall be utterly void and of no effect; and the said commissioners may take posses-

sion of the land described in such certificate, and re-sell the same." The next section requires the secretary of state, on presentation to him of the duplicate certificate and receipt, to countersign the same and deliver them to the purchaser, and also to make certain entries in the "book of entries," including a memorandum of the "amount of purchase money due." Section 41 provides that the, commissioners "shall include in one certificate of sale as many districts, lots or tracts of such lands hereafter purchased by any person at the same time, either at public sale or private entry, as such purchasers may request, and only one account shall be kept with such purchasers for all the lots or tracts included in the same certificate." Section 42 requires that all moneys paid for school or university lands shall be paid "in specie only," and that receipts therefor shall be countersigned by the secretary of state, or otherwise "shall not be evidence of payment." By sec. 50 it is declared, that "the title or fee of all school and university lands shall remain in the state until patents shall issue for the same, and no such patent shall issue except on full payment of the purchase money and interest." By sec. 51, the certificate of sale entitles the purchaser to the possession of the lands therein described, and is sufficient evidence of title to enable him, his heirs or assigns, to maintain actions for injuries done to the same, etc., etc.; while section 53 provides for the acknowledgment and recording of such certificates, and of written assignments thereof. Section 55 is as follows: "Whenever full payment shall have been made for any such lands, as required by law, and the purchaser or his legal representatives shall produce to the said commissioners the duplicate certificate of sale with the receipt of the state treasurer endorsed thereon, showing that the whole of the principal and interest due thereon has been paid, and that the holder of such certificate is entitled to a patent for the lands described therein, the original and duplicate certificates shall be canceled, and a patent from the state for the land described in such certificate, shall be issued by the commissioners to the per-

son or persons entitled thereto," etc. Section 74 declares that "the secretary of state and treasurer shall be entitled to receive twenty-five cents for each duplicate certificate of sale issued by them, and the same fees for each patent granted, to be paid by the purchaser or grantee."

By section 1 of chapter 281, Laws of 1861, section 55, chapter 28, R. S., above mentioned, was amended so as to require patents to be signed by the commissioners, instead of being "signed by the governor and countersigned by the secretary of state." By section 3 the commissioners were required to issue new patents executed by themselves in lieu of those previously executed by the governor. Section 4 reads as follows: "The said commissioners shall receive the sum of twenty-five cents for each patent issued in accordance herewith; such fees to be paid out of the income of the several funds to which such patented premises may belong; and a sufficient sum is hereby appropriated from such income out of the state treasury to pay such fees: *provided*, that the patent fees for all premises sold after the passage of this act shall be paid by the purchasers."

By the first section of chapter 159, Laws of 1863, it is declared that "no officer of this state * * shall be required to execute and deliver any agreement, contract, certificate, lease, mortgage, conveyance or other instrument in writing, in pursuance of any law of this state, upon which a stamp duty is imposed by the laws of the United States, until the party entitled to receive the same shall furnish to such officer the proper number and amount of stamps to be affixed thereto, or shall pay him the sum in money required to obtain such stamps."

Chapter 537, Laws of 1865, provides for the division ( by the commissioners of school and university lands) into two equal parts (called, respectively, the "normal school fund" and the "drainage fund") of all swamp and overflowed lands theretofore or thereafter received by the state and moneys received by it either in lieu of or in payment for such lands (secs. 1–3); for the sale of the normal school lands, and the investment of the moneys

belonging to that fund, "in the same manner and by the same officers as now provided by law for the sale and investment of the school fund" (sec. 4); and for the apportionment of the drainage fund, by said commissioners, among the counties, after certain deductions ascertained and made by them, and the share assigned to any county (to consist wholly of swamp lands, or partly of the lands and partly of money), is required to be determined in accordance with certain rules set forth in the act (sec. 6). Section 7 declares that the lands thus assigned to any county shall be held by the commissioners in trust for it, and shall be sold and conveyed by them "*exclusively for cash*, in the same manner as now provided by law for the sale of swamp and overflowed lands." The eighth and ninth sections impose certain duties upon the commissioners in regard to making out and transmitting to the clerks of boards of county supervisors descriptions of the drainage lands in their respective counties, and annual statements of lands sold, and reports of moneys belonging to the drainage fund of such counties. Section 19 requires the commissioners "in the manner now provided by law, to graduate and reduce the price per acre for which the swamp and overflowed lands may be sold," etc. Section 22 reads as follows: "The commissioners of school and university lands, in lieu of all compensation for services rendered necessary by this act, shall be entitled each to receive fifty cents on every certificate and fifty cents on every patent issued by them; and no revenue stamps need be affixed to such patents or certificates, anything in chapter 159 of the general laws of 1863 to the contrary notwithstanding."

By the first section of chapter 121, Laws of 1866, it is made the duty of the commissioners of school and university lands to immediately offer for sale at public auction all lands known as agricultural college lands; said sale to be governed by the laws now in force governing the sale of school and university lands, so far as the same shall be applicable to and not inconsistent with the provisions of this act." Section 2 provides that "at least

one-fourth of the purchase money shall be paid at the time of purchase; the commissioners may, in their discretion, require a greater portion or the whole of the purchase money to be paid at the time of purchase."

In January, 1866, the senate of this state, by resolution, instructed its judiciary committee to report what fees the school land commissioners were entitled to by law for school land certificates and patents issued by them; also, whether said commissioners could "embrace more than one tract of land lying in the same county in said certificates or patents." On the second of March the judiciary committee reported that the commissioners "are entitled to receive fifty cents each for each certificate and for each patent issued by them (sec. 22, ch. 537, Laws of 1865); that as many tracts of land may be included in one certificate as the purchaser may require (sec. 41, ch. 28, R. S.); and that there is no law prescribing the number of tracts or parcels of land to be included in one patent." See Senate Journal 1866, pp. 170, 399.

Ch. 139, Laws of 1867, provides (sec. 2) that "the sales of all swamp and overflowed lands shall hereafter be made for cash."

Ch. 151, Laws of 1869, repeals all previous laws affecting the disposition of the swamp land fund, and enacts provisions relative to that subject similar in their general character to those of ch. 537, Laws of 1865. Sec. 22 of this act is identical in terms with sec. 22 of said ch. 537.

In June, 1869, the plaintiff in this action applied to the commissioners of school and university lands for the purpose of entering and purchasing the following described lands, which were "Agricultural College lands," and were then subject to private sale, to wit: the East half of the Northeast quarter of Section 36, Town 32, Range 11, and the Northeast quarter, the East half of the Northwest quarter, the Northeast quarter of the Southwest quarter, and the Southeast quarter, of Section 2, Town 31, Range 11. The amount for which the eighty acres in said town 32 were sold was $100; and the amount for which,

the lands in said town 31 were sold, was $533.68; and the plaintiff paid these two sums to the defendant, who was then state treasurer, and also paid him (under protest) the sum of $4.50 as *fees* upon the first named eighty, and $18.00 as fees upon the tracts in town 31; receiving from him two certificates, of which the first was in the following form:

"*Agricultural College. Sale of Forfeited School Lands in Oconto County.*

$100.00                                    MADISON, June 14th, 1869.

"Received of *C. A. Harrington*, one hundred dollars, principal and interest on E. ½ of N. E. ¼ Section 36, Town 32, Range 11 E., in Oconto county, which entitles him to a patent for said land upon return of this receipt to the office of the Secretary of State.

| | |
|---|---|
| Interest to January 1, 187 , | ....... |
| Penalty and Advertising | ...... |
| Taxes | ....... |
| Taxes | ....... |
| Principal paid | $100 00 |
| Deposit Account | ....... |
| Total Dues ) Total paid | 100 00 |
| $.............. ) Fees | 4 50 |

"WM. E. SMITH, *State Treasurer.*
"COUNTERSIGNED,                                    MARTIN.
"THOS. S. ALLEN, *Secretary of State.*"

The other receipt covered all the above-described tracts of land in town 31, and stated the principal sum paid at $533.68, and the fees at $18.00; while in other respects it was similar to the above. Afterwards the plaintiff brought this action before the police court of the city of Madison, to recover $21 of the whole amount paid for fees, alleging that the only fees chargeable by law were seventy-five cents [viz: twenty-five cents for each commissioner] for each of the two patents issued to him.

The defendant answered that the plaintiff, at the time of his purchase, "made no request either at the state treasurer's office or at the school land office, that the lands so purchased should be included in one certificate, or in any number of certificates; and that, in accordance with a custom invariably followed in said school land office for years past, and in accordance with law, a

certificate was made out for each forty acre tract of said land, which certificate was duly recorded in a record book kept for that purpose in said school land office, and was placed on the files of said office ; that thirteen certificates were so made, recorded and filed, for each of which the sum of one dollar and fifty cents was charged, as allowed by law ; that two patents were made for said land, for each of which one dollar and fifty cents was charged, as allowed by law : one-third of which fees belonged to the secretary of state, and one-third to the attorney-general, and were paid over to said officers before the commencement of this suit, and the other third the defendant retained, as he lawfully might."

The defendant had a judgment in the police court, and the plaintiff appealed to the circuit court for Dane county. On the trial, T. W. Gibbs, for the defendant, having testified that he was chief clerk in the land office and had been a clerk there since 1860, was asked what regulation he found in force in the office when he entered it, as to the papers that should be issued on the sale of lands, and as to the quantity that should be embraced in one certificate or patent; and, an objection to the question being overruled, he testified as follows: "Upon the sale of land, a certificate was issued for the least government subdivision. When there was full payment, a certificate was issued, the same as on time; and a patent. When I first came into the office, the practice was to include one forty acre tract, or less. I have examined the books as far back as 1857, and find the same regulation." The books from the land office containing the entries relating to the lands described in the complaint, were then exhibited to the court and jury. The thirteen certificates made out on the patenting of said lands were also put in evidence. The witness, on cross-examination, testified : "The course of proceeding is this. The purchaser applies to purchase, by a written application. He gets a memorandum of the land, the amount necessary to pay, the part to be cash and the part on time if it be a credit sale, or the whole together if

a cash sale, with the amount of fees. With this is a blank un-
signed receipt. He takes both to the state treasurer, and pays
him the amount. The state treasurer signs the receipt,
and the secretary of state countersigns it, and the pur-
chaser brings the receipt back to our office. There is a stub
receipt, for the convenience of the office, not required by law,
to go into the secretary of state's office. When the purchaser
comes back with the receipt signed by the state treasurer, he
gets a certificate of sale if the sale is on time. This sometimes
requires time to be obtained — required for the convenience of
the commissioners. When he returns with the receipt, or prac-
tically from the stub receipt, we enter his name as purchaser on
the books. We use the same printed forms of receipt for full
payment as part; and when full payment is made at the time,
we put in 'patent' instead of 'certificate' in the receipt. I
know of cases where parties have taken full paid certificates,
then assigned them, and had patents made in the name of the
assignee. The certificates on full payments are not called for
in almost all cases. Purchasers generally know nothing about
it. When paid we write the amount in the column for cash —
the whole in full if all paid, part if part only be paid. In case
of full payment we make out certificates as if the land were
bought on time. We use the blanks for time certificates for
the certificates we make out on full payment. We then make
copies on the books, make the patents, and file away the certifi-
cates."

The jury, under the direction of the court, returned a verdict
for the defendant; and the plaintiff appealed from a judgment
thereon.

The cause was argued at the June term, 1870; but in conse-
quence of the death of Mr. Justice PAINE and a division of
opinion between Chief Justice DIXON and Justice COLE, it was
re-argued at the January term, 1871.·

*Wm. F. Vilas* and *James Byrne*, for appellant, argued that
the mode of procedure in·case of a private entry of lands,

specially indicated by ch. 28, R. S., relates entirely to purchases where only a part of the purchase price is paid, and the remainder is on a credit at interest. This manner of purchase was esteemed desirable for the state, because a safe and easy investment of the funds; and the provisions of the statute are directed entirely to the proper regulation of such purchases. Hence it is provided that a certificate shall issue to the purchaser, and its terms are carefully regulated (secs. 38, 39); and that the fee of the land sold shall remain in the state (sec. 50). It is contended that by the law it is necessary that a certificate of sale should be made in *all* cases before a patent can issue, even when the entire purchase price is paid at the time of the sale, and when a patent is at once due the purchaser; and hence that the commissioners may charge fees therefor. But suppose in such a case a patent should be directly issued, without intervening certificates: would the patent be irregularly issued, and of no effect? Would it not be said that no section or line of the statute *forbids* such a course, and that manifestly the certificate required is only in case of a time sale, where the state retains the fee? Statutes are to have a sensible interpretation. And to construe these statutes as requiring that a purchaser who has paid in full and is at once entitled to the fee, must take a certificate in duplicate, stating "the description of the land sold, the sum paid, and the amount remaining due thereon, and the times, the places, and terms of payment, and that if it shall be duly discharged, the purchaser, or his assignees or other legal representatives, shall be entitled to a patent for such land" (sec. 38), and stating also the conditions for forfeiture on non-payment of interest (sec. 39); and as also requiring that, before getting his patent, the purchaser must have endorsed on the back a receipt in full which already appears on the face, and has been once before fully certified and receipted (sec. 38), and that in the meantime (the time required by the convenience of the commissioners to make the circumlocution) the state shall have the fee—is to put an *unreasonable*

construction upon them.   It is more reasonable to leave the case of full payment to the general spirit and theory of the act, and the dictates of common sense and universal usage, that when one buys and at once fully pays for a piece of land, he shall have a deed of it.   It is said that this system is required for the benefit of the state, as a check on the commissioners. But the written application to the secretary of state, the memorandum made by him, and the receipt of the treasurer, to be countersigned by the secretary (secs. 35, 37, 38), are the real checks established by law, and are sufficient.   And a glance at the actual practice of the land office, where a clerk, at the expense of the state, writes out these certificates in a book, and makes duplicates to file away, which the purchaser never sees, never receives from the treasurer and brings to the secretary to have countersigned, and never returns to the treasurer to be endorsed as paid in full—and which these officers " sign up " at convenient intervals merely to charge fees on, while the whole practical business is done, as the law provides, by means of the application, memorandum, receipt and patent—is enough to dispel the fancy that the making of these certificates is for the benefit of the state.   2.  Granting, however, that the certificate is required as a check, why *thirteen* certificates for *two* patents?   3.  The evidence as to the custom heretofore pursued in the land office, was inadmissible.   It is a question of law.   The defendant can raise no right to charge illegal fees on the fact that he and his predecessors may have done so to other persons before the plaintiff.   Such a custom as will construe a law must not be one-sided.   It derives its force as an auxiliary to interpretation from the general intelligent concurrence of all persons concerned, dictated by no special interest, but expressing the general public understanding of the law.   Here " purchasers generally know nothing of it."   The " custom " cannot be used in favor of the persons who created it, and have continued it for their *own* interests in a way as little obtrusive on the public as possible.   See *Gillespie v. Palmer*,

20 Wis., 554. 4. Section 74, ch. 28, R. S., and ch. 189, Laws of 1861, seem to fix the fee at twenty-five cents in all for a patent. Do the general words of sec. 22, ch. 537, Laws of 1865, authorize a charge of *fifty* cents on such instrument, for each commissioner? According to the familiar rule that "general words shall be aptly restrained according to the subject matter or person to which they relate," this provision should apply only to such certificates and patents as should be issued under that act. It is entitled "an act to dispose of the *swamp and overflowed lands*, and the proceeds thereof." It relates in no word to any other subject. Some special services are required of the commissioners, and "in lieu of all compensation" for these, they are authorized to charge a double fee for instruments issued under this law. Is it reasonable to suppose that the legislature intended to make the purchaser of school, university and agricultural college lands pay for the special services of the commissioners in dividing and selling the swamp lands?

*P. L. Spooner*, for respondent:

1. Ch. 537, Laws of 1865, imposed new and onerous duties on the commissioners of school and university lands, and provided that, in lieu of all compensation for services rendered necessary by the act, they should be entitled each to receive fifty cents on *every* certificate and fifty cents on *every* patent *thereafter issued by them;* and that "no revenue stamps need be affixed to *such patents or certificates*, anything in ch. 159 of the general laws of 1863 to the contrary notwithstanding." If it had been the intention of the legislature to restrict the increased compensation to certificates and patents issued upon the sale of swamp and overflowed lands, it would have been easy to have added after the words "issued by them," the words "for such swamp and overflowed lands," or "for said lands." Instead of that, the language is "on every certificate" and "on every patent *hereafter issued by them.*" This language is so plain that construction has no office to fulfil. "Courts may give a sensi-

Harrington vs. Smith.

ble and reasonable interpretation to legislative expressions which are obscure, but they have no right to distort those which are clear and intelligible." 13 Mass., 334. The final clause of the section dispensing with stamps unquestionably includes certificates and patents for school and university lands; but that clause had reference only to "such patents and certificates" as had been previously mentioned in the section.— Counsel referred to the report of the judiciary committee of the senate in 1866, and the subsequent enactment of sec. 22, ch. 151, Laws of 1869, as showing the legislative intention as to the *amount* of fees chargeable for certificates and patents upon sales of other than swamp lands.— The construction which plaintiff puts on said section 22, namely, that it refers only to swamp and overflowed lands, is fatal to his proposition that certificates cannot lawfully be issued except upon time sales; for as to swamp and overflowed lands no time sales could be made (sec. 2, ch. 139, Laws of 1867), and so, according to his theory, no certificates could be issued for such lands.— This increase of the fees of the commissioners, on certificates and patents, was made at a time when an increase of salaries was generally felt to be necessary; it was thought expedient that this increase of their compensation should come from the purchasers of the state lands, many of whom were speculators; and if the legislature intended to allow the increased fees in case of school and university lands, as well as of other state lands, it was not possible for them to have used language more expressive of that intent than the words actually used. 2. Counsel argued that where the purchaser of state lands does not *request* that more than one tract be included in one certificate (sec. 41, ch. 28, R. S.), the commissioners have a right, and it is their duty in view of the general usage, to issue a certificate for each distinct tract. 3. Upon the question whether it was lawful for the commissioners to issue certificates in cases where lands are *paid for in full* at the time of sale, counsel argued at length the following propositions: (1.) It was the common and perhaps the univer-

sal usage in sales of public lands by the United States, and by the states, that a purchaser who paid in full at the time of entry should take a *certificate* of sale. (2.) Section 93 of the law of 1849 (sec. 112, ch. 28, R. S. 1858), which requires the purchaser for cash in hand of forfeited mortgage lands to take a certificate of sale, shows that the framers of our system saw nothing in that usage to be disapproved. (3.) The fact that certificates were issued on paid up entries under the federal and state land systems, after which ours was modelled, although those systems prescribed a form for time certificates only, indicates the intention of the framers of our system to adopt the same practice. (4.) The requirements, that whenever the secretary of state countersigns the treasurer's receipt for purchase money, he should enter in his book the number of the certificate; tnat he should transmit to the governor a monthly statement of all the certificates of sale issued, the numbers thereof, and a description of the land mentioned in each; and that he should note each sale on the plats by putting the letter " S " thereon at the time the certificate of sale is issued — show the general spirit and theory of the act to be that a certificate shall issue upon every sale. (5.) The law nowhere gives authority to the commissioners to issue a patent for land except upon the production of " the duplicate certificate of sale," which, with the original certificate, is then to be cancelled. Sec. 55, ch. 28, R. S. (6.) This court, ten years ago, recognized the validity of certificates of sale where the money was paid in full at the time of entry. *McCabe v. Mazzuchelli*, 13 Wis., 478. 4. Counsel argued that in respect to the issue of certificates in all cases of sale, the construction which had been uniformly put upon the law during the whole period of its existence, for more than twenty-one years, with the sanction of every attorney general of the state during that period, sustained by the decision in *McCabe v. Mazzuchelli*, and the judgment of the circuit court in this case, was entitled to very great weight in determining the construction. Smith on Statutory Cons., §§ 624, 625. If the

court should now hold that the construction which has been placed upon the statute in question for so many years is wrong, and that patents obtained upon the assignment of certificates issued upon cash sales are invalid, what is there which can be considered settled? If state officers who pursue exactly the path in which their predecessors had travelled for twenty years, receiving fees only in such cases as their predecessors had received them, are to be made liable thereby to indictment for misdemeanors and branded as extortioners, then good men may well fear to enter upon public trusts.

DIXON, C. J. This case was twice argued, and it needed not the able, and, as I think, most conclusive argument of the learned counsel who appeared for the defendant on the last occasion, to satisfy my mind of the correctness of the statutory construction for which he contended, and that the commissioners of the school and university lands were not only authorized, but were clearly required to make out and issue certificates upon the sale of the lands in question to the plaintiff. The cause was ably argued, in the first instance, on both sides, and from that argument and subsequent examination, which was very thorough on my part, I had fully reached the same conclusion. The work of the learned counsel, who last argued, as shown by his printed brief or argument, in pointing out and analyzing the various provisions of the statute bearing upon the question, and showing their relation to and dependence upon each other, and the consequent effect and intent of the whole, is such as to supersede and make useless any effort on my part to the same end. I cannot improve what has been so well done, and have little to say in the line of argument pursued by the same counsel, more than that I fully concur in all his reasoning, from premise to conclusion. I may be in error, and, if so, it is a most serious one, but truth compels me to say that I have no doubt, and never have had since first I understood the matter, that it was the intention of the persons who framed and of the legislature which enacted the

statute, that there should in all cases be made duplicate certificates of sale, as well where the lands were fully paid for at the time of application to purchase, as where the payment was partial — as clearly such intention as if it had been declared in so many words in the statute. This conclusion I gather, as the learned counsel has done, from the purview and entire context of the statute, as well as from particular words and passages, holding, as has been laid down, that the true rule for the construction of statutes is, to look to the whole and every part of the statute, and the apparent intention derived from the whole, to the subject matter, to the effects and consequences, and to the reason and spirit of the law; and thus, to ascertain the *true* meaning of the legislature, though the meaning so ascertained may sometimes conflict with the literal sense of the words. *Ryegate vs. Wardsboro*, 30 Vt., 746. This principle in the construction of a statute, that every part of it must be viewed in connection with the whole, and, in addition, that it must be construed so as to make all parts harmonize if practicable, and give a sensible and intelligible effect to each, and not to place one portion in antagonism to another, has been recognized and enforced in a great variety of cases, and is, in fact, elementary. *Ogden vs. Strong*, 2 Paine C. C. R., 581; *Brooks vs. Mobile School Commissioners*, 31 Ala., 227; *Dillingham vs. Fisher*, 5 Wis., 475; *Calkins vs. Harvey*, 13 Wis., 370; *Mason vs. Finch*, 2 Scam., 223; *The Belleville Railroad Company vs. Gregory*, 15 Ill., 20; *Torrance vs. McDougald*, 12 Ga., 526.

I desire to advert merely to three or four sections of the statute, which, in my judgment, are of the greatest weight, and then to refer to some other rules for the construction of statutes, which seem to me to have very strong application.

Section 42 provides (I refer to the present revision), that *all* moneys paid on account of school and university lands, whether for principal or interest, shall be paid to the state treasurer, who shall give his receipt therefor, and every such receipt or writing shall be countersigned by the secretary of state.

Section 43 is in these words : "The secretary, upon countersigning such receipt or writing, shall charge the said treasurer with the amount received by him as therein mentioned, in a book to be kept for that purpose, and shall also enter the name of the person paying the same, *the number of the certificate upon which the amount shall be paid*, and the time of payment." This is a positive and most unambiguous direction that *all* moneys for school or university lands *shall* be paid to the treasurer, for which a receipt *shall* be given by him, and countersigned by the secretary, and that upon countersigning the receipt, the secretary *shall* enter, in a book to be kept by him for that purpose, *the number of the certificate upon which the same is paid.* The plain language then is, that for *all* moneys paid, the secretary *shall enter the number of the certificate upon which the payment is made.* What more clear and unequivocal evidence of intention can be required than this, that a certificate of sale is in all cases to be made? or how could the legislature have more clearly manifested such intention? And how is it possible for the secretary of state to comply with this obvious requirement of the statute unless a certificate is in every case made? And here another rule of interpretation becomes directly applicable, which is, that general words in a statute must receive a general construction, unless there be something in it to restrain them, or as it is otherwise frequently expressed, if there be no express exception. *Demorest vs. Wynkoop*, 3 Johns. Ch., 142 ; *Torrance vs. McDougald*, 12 Ga., 530 ; *Collins vs. Carman*, 5 Md., 505, 533. It must be admitted that the word *all*, or the words *all moneys*, are very general, and it is not pretended, nor can it be, that there is anything elsewhere in the statute restraining them, or any express exception. The case in 12 Ga., 530, arose upon the same word, *all*, in a statute, and it was held that its application could not be restrained, the statute itself containing no exception. In that case LUMPKIN, J., informs us that the rule was considered so inflexible that, the *Statute of Wills* (32 Hen. VIII.) having authorized all and every person or persons to devise their lands,

it was feared it might enable infants and insane persons to do it: and the statute of 34 Hen. VIII. was consequently passed, to introduce these exceptions. *Beckford vs. Wade*, 17 Ves., 88. And in 5 Md., 505, which was certainly a hard case, and one which appealed most strongly to the sympathy of the court to find its way out of and escape the operation of this rule, it was still held to be inflexible. The question was upon the right of a widow, who was *insane* at its date, and so continued, to renounce the provision made for her in the will of her late husband, and to receive her share of his estate as given by law. By the statute of the state, it was necessary that she should *dissent* from the provision made in the will, a thing which, being insane, she was incapable of doing. The language of the statute was comprehensive enough to include *every widow*, whether sane or insane, and the statute having made no exception in favor of the latter, it was decided that none could be made by the courts, whether of law or equity. It clearly appears to me that upon these provisions of the statute, and this rule of construction alone, no exception being found in the statute, and no language from which one is fairly or necessarily to be implied, the construction which the statute has always received at the hands of the commissioners is the true one and must stand. But this construction and the conclusion that the framers intended that certificates of sale should in all cases be issued, are most clearly corroborated and shown by other provisions. The 55th section declares when and how patents for the lands shall be issued, and it is only upon the production of the duplicate certificate of sale, with the receipt of the state treasurer, showing that full payment has been made, that the issue of any patent is authorized. Without the production of the duplicate certificate, the commissioners have no authority whatever to issue a patent, which, in my judgment, is a most convincing circumstance in favor of the construction contended for in behalf of the defendant.

And if any further proof be necessary to show the intention

that certificates of sale were to issue where the lands were fully paid for at the time of purchase, as well as where the payment was partial, or the sale upon credit, it is found in section 112. In that and the five preceding sections, provision is made for the sale of "mortgaged lands," or lands bid in by the state on loans from the school and university funds.    Section 112 enacted: "In case of the sale of any such lands to any person for cash, on production of the treasurer's receipt for the purchase money, the commissioners shall give to the purchaser a certificate which shall entitle him to demand and receive a deed for said land, to be executed by the governor of this state, and recorded in the office of the secretary of state."    It is true that this section was amended, and the issue of a certificate dispensed with, by section 2, chapter 281, Laws 1861, but such amendment extended only to "mortgaged lands," and did not include other lands sold for cash.    But the amendment or repeal of a section, or portion of a statute, does not prevent a resort to the part amended or repealed, in interpreting so much of the statute as remains in force.    *Bank of Savings vs. The Collector*, 3 Wallace, 495.    And so resort may be had to section 112, as it stood before amendment, and as part of the context of the statute as originally enacted, to assist in ascertaining the true meaning of other parts of it.    "If he who has expressed himself in an obscure or equivocal manner, has spoken elsewhere more clearly on the same subject, he is the best interpreter of himself.    We ought to interpret his obscure or vague expressions in such a manner that they may agree with those terms that are clear and without ambiguity, which are used elsewhere, either in the same treaty or some other of the like kind." Vattel's Rules, 17.    Potter's Dwarris, 128.    "It gives great light to the interpretation of obscure passages, to compare them with others that have some affinity with them ; or to compare them with what goes before or follows in the context." Puffendorf's Rules, id. 133.    And see Rutherford's Rule, id. 136, 137, upon this *circumstance* of explanation: "as they both

came from the same hand, so they are both found together in the same writing." And also Domat's Rule, id. 140: "We must prefer the evident meaning of the whole law, to the inconsistent meaning of a defective expression." Section 112 is, therefore, for our present purpose, still a part of the statute, and it indubitably establishes the intention of the legislature, that, upon a *full paid cash sale, a certificate of sale* as well as a *receipt* for the purchase money was to be issued. We have here the only instance in the statute where it became necessary for the framers to make direct, separate and express provision for a cash sale, and we see the provision which was made. It is the key which unlocks and exposes to full view the hidden or doubtful intent of the law makers, if hidden or doubtful it may otherwise be said to have been, and which gives us an exact knowledge of their ideas as to what was to be done in such a case. The sale of the "mortgaged lands" here provided for was part and parcel of the same general system enacted for the sale and disposition of the other lands belonging to the state, and it cannot for a moment be supposed that it was the intention of the legislature to provide for the issue of a certificate of sale upon full cash payment for such lands, and yet that only a *receipt* should be given upon a like payment for other lands. Every word and letter of the statute forbids such interpretation, for it would seem almost absurd to suppose that the legislature, having already intentionally enacted that only a receipt should be given upon a sale for cash of other lands, should have thus industriously provided for the giving of a certificate of sale as well as a receipt upon cash payment for mortgaged lands, thereby engrafting an entirely new feature upon the system. I say, with all due respect for those who may differ from me in opinion, that this seems to me most absurd; and yet, if I am wrong, such must have been the construction during all the time section 112 was in force, which was continuously from 1849 to 1861. (R. S. 1849, ch. 24, sec. 93.) Section 112 has been modified, which only affects cash

sales of mortgaged lands, and not such sales of other lands. I am clearly of the opinion, therefore, that the mode prescribed for cash sales of mortgaged lands was not a departure from that prescribed and intended to be for like sales of other lands. It was a part of the same general plan, which was designed to be harmonious and uniform throughout, and not an anomalous or exceptional proceeding introduced as to sales of mortgaged lands when a different mode had been prescribed as to sales of exactly the same character of all other lands. Section 112, therefore, illustrates and enforces in the strongest possible way the intention of the legislature as to the issue of certificates upon other cash sales. It makes such intention clear, if otherwise or upon other portions of the statute, by themselves considered, it might have seemed doubtful. It unfolds and discloses to our view just what was passing in the minds of the law makers upon the very point under consideration.

In opposition to this construction of the statute, which I think beyond doubt the correct one, the claim or argument merely is, that the legislature have prescribed no form for the certificate upon a sale of land for cash, and that the making of the certificate is an idle ceremony or routine which might as well or more conveniently have been dispensed with. Section 38 prescribes the form and contents of the duplicate certificate upon a time sale. It is silent as to the form and contents of the certificate upon a sale for cash, and the same are not elsewhere prescribed in the statute. It is said, as against other provisions of the statute, which clearly require a certificate upon a cash sale, that this indicates the opposite intention, and that no certificate is required. This, in my judgment, is a somewhat novel mode of arguing away or repealing the express language and requirement of a statute. It is in fact saying no less than this, that where a statute directly requires commissioners authorized to sell public lands for cash to give a certificate upon such a sale, yet that no certificate can be given and none was intended, because the legislature did not at the same time instruct or direct

the commissioners as to what should be the precise form and contents of the certificate. It is saying no less than that, although expressly required, no certificate can be issued unless its form or contents are prescribed by the statute. If the legislature enact or require that which in the nature of things is impossible, I suppose the act is a nullity, and in such case it may be fairly presumed that the legislature did not so intend, or that the act proceeded from some mistake or misunderstanding. If it be true that it is impossible for the commissioners to make the certificate unless the legislature gives the form or instructs them how to do it, then the argument should prevail on this ground. But otherwise I think it should not. How was it all the time section 112 was in force? Was it impossible for the commissioners to comply with the positive requirement of that section, and was so much of the section as related to the giving of the certificate a nullity, because the legislature had not enacted the form or contents of the certificate? Or did the want of a form or statement of its contents in the statute show that no certificate was necessary or none was intended? An affirmative answer to these questions would lead to the affirmance of the proposition that no certificate is required or intended to be given upon a cash sale of other than mortgaged lands. An answer in the negative would lead to the very opposite conclusion. I, for one, cannot hesitate. I think a negative answer must be given. I agree with the learned counsel for the defendant when he says it was left to the common sense and discretion of the commissioners to prescribe a form for themselves, and which should comply with the requirement of the statute. A matter so plain and easy of comprehension required no legislative directions, and none were deemed necessary, especially as the legislature had no conditions or restrictions to impose, as in the case of time sales, which is the reason for the specific directions given respecting certificates of that class.

And as to the other branch of the argument or claim, that the making of the certificates is useless, or might have been

conveniently or properly omitted, I have only to say that we do not sit here to revise or correct the action of the legislature in such matters. We have no legislative power, and cannot dispense with a certificate because it may be shown that the legislature might have conveniently or wisely done so. The construction of the law belongs to this court, but not its policy, and we cannot look to reasons of that kind for disregarding the plain requirements of a constitutional enactment. The legislature may, if it chooses, require that to be done which to others seems idle and useless. It is for the legislature, and not for the courts, to judge whether it is so.

Nor do I, in the view I have taken of the question, overlook the fact that by the statute as originally enacted, and as it stood until the decision of this court in *McCabe vs. Mazzuchelli* in 1861 (13 Wis., 478), all patents for lands sold by the state were to be executed by the governor. This is a most important circumstance favoring the construction for which I contend, and one which has not escaped the attention of counsel. The certificate, with the receipt of the state treasurer endorsed thereon, showing full payment, was the evidence, and the only evidence, upon which the governor was to act in signing the patent. Since the decision above referred to, provision has been made for the execution of conveyances by the commissioners, but there has been no change in the phraseology of the statute respecting the issue of certificates of sale.

And here, too, I notice what is said by counsel, of the laws of the United States and of other states for the sale and disposition of their public lands, of the construction of those laws and the common usage under them, and of the points of similarity between them and the law we are construing, showing that the latter is based upon and intended as an enactment or adoption of very nearly the same system. On the supposition that the construction is doubtful, it is a point deserving serious consideration, as furnishing a clue to the intention of the framers. It is a well established rule of interpretation, that the general sys-

tem of legislation upon the subject matter may be taken into view, in order to aid the construction of one statute relating to the subject, and that it is proper to consider other statutes *in pari materia*, whether they are repealed or unrepealed. *Church vs. Crocker*, 3 Mass., 17–21; *Thayer vs. Dudley*, id., 296; *Mendon vs. Worcester*, 10 Pick., 235; *Holbrook vs. Holbrook*, 1 Pick., 248, 254; *Holland vs. Makepeace*, 8 Mass., 418, 423; *State vs. Baldwin*, 2 Bailey, 541; *State vs. Fields*, id., 554. This rule of construction extends to the statutes of other states or countries, which were the source or fountain from which the statute in question was drawn.

And there are other rules of construction I have considered, and which, perhaps, I ought not to omit here. One rule is, that a statute ought, upon the whole, to be so construed that, *if possible*, no *clause, sentence* or *word*, shall be *superfluous, void* or *insignificant*. *James v. Du Bois*, 1 Harrison (N. J.), 285, 293; *Hutchen v. Niblo*, 4 Blackf., 148. Another and kindred rule is, that every clause and word of a statute shall be presumed to have been intended to have some force and effect. *Opinion of Justices*, 22 Pick., 571; *Same*, 7 Mass., 523; *Green v. Cheek*, 5 Porter (Ind.), 105. These rules come very powerfully in aid of the construction I put upon sections 42 and 43, and particularly on the word *all*, in section 42, which must be construed as I construe it, or else be wholly deprived of any significance or force whatever.

Another rule of construction is, that where a known statute has been re-enacted in terms, its interpretation will be presumed to have been also adopted by the legislature. *McKenzie v. The State*, 6 English, 594; *Anthon v. The State*, 29 Ala., 27. The statute in question was originally enacted in 1849, and subsequently re-enacted in 1858. Long before, and at the time of such re-enactment, it had received a practical and well known interpretation by the officers whose duty it was to execute it, the commissioners of the school and university lands, one of whom was the attorney general of the state. With such estab-

lished and known practice and construction as to the issuing of the certificates in cases like the present, the legislature re-enacted it without change or modification. If the language of the statute is ambiguous, or the intent doubtful, neither of which I can conceive, then this rule is applicable; for the re-enactment was a legislative approval of the construction which had been previously given.

And further, on the principle of doubt or ambiguity, there are still other rules of statutory construction, which I think should govern. I do not, however, concede that the meaning is doubtful or the intent uncertain, unless it may be on the principle stated by Mr. Smith, in his valuable commentaries on statute and constitutional law, that " the uncertainty of the sense to be given to a law does not proceed *solely* from the obscurity or other defect in the expressions used, but also from the limited nature of the human mind, which cannot foresee all cases and circumstances, nor take into view all the consequences of what may be enacted." (Smith's Commentaries, sec. 487.) The statute in question was enacted and has been continuously interpreted, understood and acted upon by the executive department of the government, the officers appointed by law to carry its provisions into effect, as requiring the issue of certificates upon cash sales, for a period of over twenty-one years, and during twelve successive administrations of the state. Long and uninterrupted practice under a statute, especially by the officers whose duty it was to execute it, is good evidence of its construction, and such practical construction will be adhered to, even though, were it *res integra*, it might be difficult to maintain it. *McKean v. Delancy's Lessee*, 5 Cranch, 22; *Edwards' Lessee v. Darley*, 12 Wheat., 206, 210; *Morrison v. Barksdale*, Harper, 101; *Attorney General v. Bank of Cape Fear*, 5 Iredell's Eq.; *Rogers v. Goodwin*, 2 Mass., 475; *Packard v. Richardson*, 17 Mass., 144; *Opinion of the Justices*, 3 Pick., 517, 518.

In *United States v. Gilmore*, 8 Wallace, 330, it was held, as stated, and I have no doubt correctly, by the reporter, that

"constructions of statutes, in relation to accounts of individuals with the United States, made by the accounting officers of the treasury, especially when so long continued as to become a rule of departmental practice, are entitled to great consideration, and will in general be adopted by this court."

And in this case the important fact is not to be overlooked, that the highest law officer of the state — the attorney general — has always been one of the commissioners, whose duty it was to construe and carry the law into effect. Great weight is undoubtedly to be attached to a construction which has thus been given. During the time this uniform construction and practice have prevailed, the office of attorney general has been filled by nine different individuals; all of them gentlemen of learning and accomplishment in their profession; and of the other commissioners, some have been lawyers, and four at least have since held the office of governor. The concurrent opinion and advice of these attorneys general and of the other commissioners, extending through a period of so many years, ought, it would seem, to be some evidence of what the law is; and some persons might be disposed, perhaps, to think, evidence equal to a decision of this court. The supreme court of the United States has on more than one occasion paid great respect to such evidence on questions of statutory construction. *Union Insurance Company v. Hoge,* 21 How., 36, 66; *Havemeyer v. Iowa County,* 3 Wallace, 291. In the former case the court say, speaking of the practical construction of an act of the legislature of the state of New York by the public officers of that state, including the attorney general, that it is deserving of consideration, and although it cannot be admitted as controlling, it is not to be overlooked, and perhaps should be regarded as decisive in a case of doubt or where the error is not plain.

It was suggested on the argument, that the opinions and advice of the attorneys general should be disregarded, because they were influenced by the fees to be obtained upon issuing the certificates. It cannot be supposed that those officers could

be influenced by any such paltry and unworthy consideration; but the truth is, no fees went to the attorney general until the passage of the act of March 19, 1859. Laws of 1859, ch. 189. R. S., ch. 28, sec. 74. Before that time, and when the construction and practice were fully established, the attorneys general may possibly have been influenced by the rule laid down by JUDGE STORY, that a statute prescribing compensation to a public officer, the meaning of which is doubtful, and which is susceptible of a double construction, should be construed in favor of the officer. *United States vs. Morse*, 3 Story's R., 87.

And neither is the report of the judiciary committee of the senate of 1866, in pursuance of the resolution directing the inquiry, to be omitted in our consideration of the question. Senate Journal 1866, pp. 170, 359. It was by gentlemen, five in number, of experience and ability in the legal profession, acting judicially, and, like the attorneys general and others, under the sanction of an official oath. It is part of the practical exposition which the statute has received, and furnishes strong evidence of the sense and meaning of the law, as understood by the legislature itself.

All these latter considerations and rules of construction enter very strongly into the question upon the theory that the construction is doubtful, and must, in my judgment, have a controlling effect. But, as I have already said, I cannot regard the construction as doubtful upon the words of the statute itself. It is plain and certain that a certificate is in all cases to be given, and that no patent can issue upon presentation alone of the treasurer's receipt for the money ; and to say, upon grounds of convenience or policy or otherwise, that a patent can be so issued, is to attribute to the legislature an intent which the language of the statute clearly denies and forbids. "We are not," as the court of appeals of Maryland correctly say, "at liberty to imagine an intent, and bind the letter of the act to that intent, much less can we indulge the license of striking out and inserting and remodelling, with the view of making the

letter express an intent which the statute in its native form does not evidence. Every construction is therefore vicious which requires great changes in the letter of the statute." *Alexander v. Worthington*, 5 Md., 485.

The only remaining question in the case concerns the amount of compensation which the commissioners were entitled to charge and receive, whether it was fifty cents for each commissioner for every certificate, or only twenty-five cents. This question depends for its solution upon the construction and effect of section 22, chapter 537, Laws of 1865. If that section is general in its operation and extends to certificates and patents for all lands held by the state and sold by the commissioners, then they were entitled to fifty cents each, but otherwise only to twenty-five cents each. It reads as follows : " The commissioners of school and university lands, in lieu of all compensation for services rendered necessary by this act, shall be entitled each to receive fifty cents on every patent, and fifty cents on every certificate hereafter issued by them; and no revenue stamps need be affixed to such patents or certificates, anything in chapter 159 of the general laws of 1863 to the contrary notwithstanding."

The act of which this section is a part, is entitled " an act to dispose of the swamp and overflowed lands, and the proceeds therefrom," and all the remaining sections of it relate exclusively to the disposition of such lands and of the proceeds. The inquiry therefore is, whether the words "every certificate " and " every patent hereafter issued " are to be restricted to certificates and patents for swamp lands, or whether certificates and patents for all other lands were intended. Had this section ended with the first clause, and no provision been made with respect to revenue stamps, it is not impossible that its operation might have been limited to certificates and patents issued under the act; but the last clause, providing that no revenue stamps need be affixed to such patents or certificates, clearly indicates that a more extended operation was intended. To limit the first

clause to certificates and patents for swamp lands would be to limit the last clause also, so that the legislature would be held to have intended that no revenue stamps should be affixed to certificates and patents for swamp lands, whilst to certificates and patents of all other lands the same should be affixed according to the provisions of chapter 159 of the laws of 1863.

This construction seems to me quite inadmissible, and quite contrary to what must have been the intention of the legislature by the clause in reference to revenue stamps. The intention obviously was to withdraw all certificates and patents from the operation of the act of 1863, as it was well understood by the then recent decision of this court (19 Wis. 369), that the affixing of such stamps could not constitutionally be required by congress. General operation must therefore be given to the last clause, according to the intention of the legislature; and this being so, it follows that the first clause was also intended to be general in its effect, and, therefore, that the compensation to which the commissioners were entitled was fifty cents for each certificate and each patent issued to the plaintiff.

I think the judgment of the court should be affirmed.

LYON, J.. concurs.

COLE, J., dissents.

*By the Court.*—Judgment affirmed.