The State vs. Pullman's Palace Car Co. and another.

---

THE STATE vs. PULLMAN'S PALACE CAR COMPANY and another.

*April 7 — October 13, 1885.*

*Taxation: Sleeping cars: License fee: Statute construed: Local traffic: Inter-state commerce: Constitutional law.*

Ch. 353, Laws of 1883, providing that owners of palace, drawing-room, and sleeping cars shall annually return to the railroad commissioner a "statement of the gross earnings made by the use of such cars

64   89
83   155

64        89
57 LRA  59n

64        89
60 LRA  671
60 LRA 685n

The State vs. Pullman's Palace Car Co. and another.

*between points within the state* of Wisconsin," and shall pay a license fee of two per cent. of such earnings, requires a statement only of the earnings derived from the use of such cars in transporting passengers who both get on and off at points within the state. [Whether if construed otherwise the act would be constitutional, not determined.]

This is an application for an injunction to restrain the defendants from using palace, drawing-room, or sleeping cars within this state, on the ground that the defendant *Pullman's Palace Car Company* has not made the reports and refuses to pay the license fee required by ch. 353, Laws of 1883. The *Chicago, Milwaukee & St. Paul Railway Company* is made a defendant for the reason that it hauls the cars of the principal defendant upon its lines in this state. The application is based upon the complaint or information, the answer of the principal defendant thereto, the demurrer of the state to such answer, and the other papers in the case. The facts sufficiently appear from the opinion.

For the plaintiff there was a brief signed by the *Attorney General* and *H. W. Chynoweth*, Assistant Attorney General, and the cause was argued orally by *Mr. Chynoweth.* They contended (1) that ch. 353, Laws of 1883, requires payment to the state of two per cent. of all the earnings of the car company, made by the use of its cars within the state; and (2) that the law is a valid exercise of the taxing power of the state. No corporation, whether engaged in inter-state business or not, has any power or right to act beyond the limits of the state creating it, except by virtue of a comity between the states or of positive legislation by the state in which it wishes to act, giving it that privilege. The state of Wisconsin might exclude the Pullman company altogether, and may therefore prescribe the terms upon which it may do business within the state. *W. U. Tel. Co. v. Lieb,* 76 Ill. 172; *State v. B., C. & M. R. Co.* 25 Vt. 433; *Thompson v. Waters,* 25 Mich. 214; *Milnor v. N.*

The State vs. Pullman's Palace Car Co. and another.

*Y. & N. H. R. Co.* 53 N. Y. 363; *Martin v. M. & O. R. Co.* 7 Bush (Ky.), 116; *W. U. Tel. Co. v. Mayer*, 28 Ohio St. 521; 1 Rorer on Railroads, 83; 1 Redf. on Railways, 294; *Stout v. S. C. & P. R. Co.* 3 McCrary, 1; *State Treasurer v. Auditor*, 46 Mich. 224; 2 Dillon on Mun. Corp. 745; *Att'y Gen. v. B. S. Mining Co.* 99 Mass. 148; Cooley's Con. Lim. 152; *Morse v. Home Ins. Co.* 30 Wis. 496; *Drake v. Doyle*, 40 Wis. 175; *Doyle v. Continental Ins. Co.* 94 U. S. 535; *Ducat v. Chicago*, 48 Ill. 172; *Firemen's B. Asso. v. Lounsbury*, 21 Ill. 511; *Fire Dep't of Milwaukee v. Helfenstein*, 16 Wis. 136; *People v. Imlay*, 20 Barb. 68; *Bank of Augusta v. Earle*, 13 Pet. 519, op. by TANEY, C. J.; *Cincinnati M. H. A. Co. v. Rosenthal*, 55 Ill. 85; *Fire Dep't v. Noble*, 3 E. D. Smith, 440; *Fire Dep't v. Wright*, id. 453; *De Groot v. Van Duzer*, 20 Wend. 390; *Comm. v. Milton*, 12 B. Mon. 212, 218; *Tatem v. Wright*, 23 N. J. 429; *Paul v. Virginia*, 8 Wall. 168; *Liverpool Ins. Co. v. Massachusetts*, 10 id. 566; *Ducat v. Chicago*, id. 410; *Pensacola Tel. Co. v. W. U. Tel. Co.* 96 U. S. 1. The very business in which the Pullman company is engaged is one which calls for the consent of the sovereign power of the state and involves the exercise of sovereignty. It pursues its business upon the railway highways of the state, which are obtained by the exercise of the power of eminent domain and can only be so obtained. The rules which apply to corporations would in this respect apply to individuals also. But apart from the question of incorporation or of the power of eminent domain, the statute in question is a valid enactment. The license fee provided for is not a tax upon the property of the company, real or personal, and is not a tax upon the money of the company. It is merely a license tax upon the franchise granted to the company, in consideration of the grant. A state is not obliged to concede to a foreign corporation higher privileges than it grants to its own; and it may exact from a foreign corporation the same tribute

that is paid by its own. The gross earnings are resorted to merely as a means of ascertaining what the privilege granted is fairly and equitably worth. *Phila. Contributorship v. Comm.* 98 Pa. St. 48; *Ins. Co. of N. A. v. Comm.* 87 id. 173; *Walker v. Springfield*, 94 Ill. 364; *Att'y Gen. v. B. S. Mining Co.* 99 Mass. 152; *Comm. v. Lancaster S. Bank*, 123 id. 493, 495; *State Tax on Railway Gross Receipts*, 15 Wall. 296; *Kettanning Coal Co. v. Comm.* 79 Pa. St. 100; *State Railroad Tax Cases*, 92 U. S. 575; *Society for Savings v. Coite*, 6 Wall. 594; *State v. Stephens*, 4 Tex. 137; *Sacramento v. Crocker*, 16 Cal. 119; *State v. Coleman*, 4 id. 46; *State Treasurer v. A., T. & S. F. R. Co.* 19 Kan. 303; 1 Desty on Taxation, 218, 303 *et seq.;* Cooley's Con. Lim. 616; Hilliard on Taxation, 160, 161; Cooley on Taxation, 384; *Osborne v. Mobile*, 16 Wall. 479; *Erie R. Co. v. Pennsylvania*, 21 id. 492; *Delaware Railroad Tax Case*, 18 id. 206; *Cent. Pac. R. Co. v. State Board*, 60 Cal. 35; *Thomson v. Pac. R. Co.* 9 Wall. 587; *Railroad Co v. Peniston*, 18 id. 5; *Huntington v. C. P. R. Co.* 2 Sawy. 503; *W. U. Tel. Co. v. Richmond*, 26 Grat. 1; *Pullman S. C. Co. v. Gaines*, 3 Tenn. Ch. 587; *State v. Am. Exp. Co.* 7 Biss. 227; *Memphis & L. R. R. Co. v. Nolan*, 14 Fed. Rep. 532; *Am. U. Exp. Co. v. St. Joseph*, 66 Mo. 675; *Wolcatt v. People*, 17 Mich. 68; *Kitson v. Mayor*, 26 id. 325; *Fry v. State*, 63 Ind. 552; *Shepperd v. Co. Comm'rs*, 59 Ga. 535; *Wiggins Ferry Co. v. East St. Louis*, 107 U. S. 365; *Tel. Co. v. Texas*, 105 U. S. 460; *State v. P., W. & B. R. Co.* 45 Md. 361; *Osborne v. Mayor*, 44 Ala. 493; *Southern Exp. Co. v. Mayor*, 49 id. 404; *A. T. & O. R. Co. v. Comm'rs*, 87 N. C. 129; Burroughs on Taxation, 150, sec. 79 *et seq.; Maryland v. B. & O. R. Co.* 34 Md. 344.[1]

---

[1] The Assistant Attorney General has also called the attention of the reporter to the following cases, published since the determination of the principal case: *Fargo v. Auditor General*, 24 N. W. Rep. (Mich.), 538; *Railroad Commission Cases*, 116 U. S. 307, especially *Stone v. I. C. R. Co.* p. 347; *Pickard v. Pullman S. C. Co.* 117 U. S.

*Alfred Ennis*, attorney and counsel, and *D. S. Wegg*, of counsel, for the defendant *Pullman's Palace Car Company*, after arguing that the statute should be construed to apply only to earnings realized from passengers who both get on and off at stations within the state, urged further that if construed as contended on the part of the state, the act would be unconstitutional, under subd. 1, 3, sec. 8, art. I, Const. of U. S., as an unauthorized regulation of inter-state commerce. It cannot be sustained as a tax upon the business or occupation of the defendant. The taxing power of the state is limited to persons, property, and business within its jurisdiction. *State Tax on Foreign-held Bonds*, 15 Wall. 319; *Tappan v. Merchants' Nat. Bank*, 19 id. 490; *St. Louis v. Ferry Co.* 11 id. 430. As to the person, the domicile of the Pullman company, for every jurisdictional purpose, legislative or judicial, is Illinois, by which state it was incorporated, in which its franchises exist, where its offices and place of business are located, and of which state it is a citizen. As to the property of the company, it owns none in Wisconsin except sleeping cars, all of which except two run from without the state into or across it, stopping only for a short time at the railway stations. These cars have no *situs* in the state so as to subject them to taxation. *Hayes v. Pacific M. S. Co.* 17 How. 599; *Morgan v. Parham*, 16 Wall. 474. As to the business, that done where the passengers both get on and off at points wholly within the state is conceded to be subject to taxation; but the business done in furnishing accommodations for inter-state passengers is not transacted wholly within the territory of the state, and is therefore not a *business within its jurisdiction* so as to be taxable. Such business is an essential element of inter-state commerce, and no state has the right to destroy it; and the right to tax involves the right to destroy. Wisconsin is so situated that all the trade of the great, new, and as yet only partially developed Northwest territory passes

over her soil. If she can prohibit the running of sleeping cars, engaged in this commerce, over her territory, why may she not at pleasure apply such a prohibition hereafter to every branch and department of inter-state commerce? In the case of *Nathan v. Louisiana*, 8 How. 73, the person taxed was a citizen of, and the *situs* of his business was in, Louisiana. In *Osborne v. Mobile*, 16 Wall. 479, the business taxed was located in Mobile. In *St. Louis v. Ferry Co.* 11 Wall. 423, and 107 U. S. 365, the domicile of the company and the *situs* of the property were regarded as essential elements in the question of jurisdiction to tax. See 107 U. S. 373–4. The *Granger* cases (*Munn v. Illinois*, 94 U. S. 113; *C., B. & Q. R. Co. v. Iowa*, id. 155; *Peik v. C. & N. W. R. Co.* id. 164) related to elevators and railroads situated entirely within a state, and the statutes sustained in no way interfered with inter-state commerce. *Hall v. De Cuir*, 95 U. S. 588. But a state law endeavoring to fix rates, even within its own jurisdiction, upon shipments which come into its territory from other states, go from it outside its borders, or pass through its limits, is void. *I. C. R. Co. v. Stone*, 20 Fed. Rep. 468; *Kaeiser v. I. C. R. Co.* 18 id. 151; *Louisville & N. R. Co. v. Railroad Comm.* 19 id. 679; *Carton & Co. v. I. C. R. Co.* 59 Iowa, 148. The reasoning in *Pullman S. C. Co. v. Gaines*, 3 Tenn. Ch. 587, is clearly fallacious. Mere temporary presence of the property of the company, while in transit, did not and could not confer upon Tennessee the power to levy a tax thereon. *Robinson v. Longley*, 1 Pac. Rep. 377. And that the Pullman company is neither a common carrier nor an innkeeper, as suggested in the Tennessee case, is expressly held in *Pullman Co. v. Smith*, 73 Ill. 360. See *Moran v. New Orleans*, 112 U. S. 69. It cannot be held that the statute is intended to impose a license upon local business only, and to measure the license by computing the percentage upon something else. *Cook v. Pennsylvania*, 97 U. S. 566; *Tele-*

*graph Co. v. Texas*, 105 id. 460; *Welton v. Missouri*, 91 id. 275. When the business of running and using sleeping cars is not *local*, but for the accommodation of inter-state passengers, then such business does not require any license from the state, but can be regulated only by Congress. The state cannot, therefore, exact any fee for the privilege of doing such business. *Minot v. P., W. & B. R. Co.* 2 Abbott (U. S.), 324. If the tax be construed as one upon the earnings, rather than upon the business, of the company, then such earnings include those of an inter-state nature, and as to such earnings the company exercises no privileges conferred upon it by the state; and, having no domicile or *situs* in the state, its earnings of that nature are beyond the power of interference by the state. *State Tax on Railway Gross Receipts*, 15 Wall. 284; *Delaware Railroad Tax*, 18 id. 206; *Railroad Co. v. Maryland*, 21 id. 457; *Indiana v. Pullman's P. C. Co.* 11 Biss. 561. Counsel also argued at length that the state had no greater right to exclude or impose restrictions upon foreign *corporations*, doing an inter-state business, than it had in reference to individual citizens of other states, citing and commenting upon the cases of *Morse v. Home Ins. Co.* 30 Wis. 496; 20 Wall. 445; *Hartford F. Ins. Co. v. Doyle*, 6 Biss. 461; 94 U. S. 535; *Bank of Augusta v. Earle*, 13 Pet. 519; *Nathan v. Louisiana*, 8 How. 73; *Runyan v. Coster*, 14 Pet. 122; *La Fayette Ins. Co. v. French*, 18 How. 404; *Paul v. Virginia*, 8 Wall. 168; *Ducat v. Chicago*, 10 id. 410; *Railroad Co. v. Koontz*, 104 U. S. 5; *Pensacola Tel. Co. v. W. U. Tel. Co.* 96 id. 1.

The following opinions were filed June 1, 1885:

TAYLOR, J. This action was commenced by the state in this court against the defendants for the violation of ch. 353, Laws of 1883, by an alleged refusal on the part of the *Palace Car Company*, to pay two per cent. of the gross earnings of said company into the treasury of the state, as

required by said chapter, in order to entitle said company to run its cars within this state, and its refusal to make a proper return of its earnings as required by said law, and this court is asked to enjoin said companies from running palace, drawing-room, or sleeping cars within this state.

The defendants claim, in their answer, that they have made return of their gross earnings as required by said chapter, and are entitled to have a license from the state to continue running their cars in the state.

The contention on the part of the defendants is that, under said law, the *Palace Car Company* is only required to return to the railroad commissioner a true statement of their gross earnings made by the use of their cars within the state, derived from their use in transporting passengers from point to point within the state, and not their earnings derived from transporting from points outside of the state to points within the state, or from points within the state to points outside of the state, or from a point outside of the state to another point outside of the state when the cars used in transporting from such last-mentioned points pass through the state or any part of it.

It is admitted by the learned attorney general that if the car company is only required by the statute to make return of its earnings derived from the transportation of persons from one point within the state to another point within the state, and not from passengers carried through the state, or from a point in the state to a point outside of the state, or from a point outside of the state to a point within the state, then the company has complied with the law, and the state has no cause of complaint.

On the part of the learned counsel for the defendants it is also contended that if the statute receives the construction contended for by the learned attorney general, then it is void, as being in contravention of the constitution of the United States, which provides that " Congress shall have the power

to regulate commerce among the several states," and so the state would have no case against them.

After a careful consideration of the learned and able arguments submitted by the counsel for the respective parties upon the question of the construction of the statute in question, we have come to the conclusion that the construction put upon it by the defendants must be held to be its true construction, and that under its provisions the car company is only required to return the gross earnings it derives from the use of its cars in transporting passengers from one point to another, wholly within the state. The sections of the statute which are to be construed, are sections 2, 3, and 4, which read as follows:

" Sec. 2. Every such owner of the cars mentioned in section one, except railway companies as aforesaid, shall on or before the tenth day of February in each year, make and return to the railroad commissioner a true statement of the gross earnings made by the use of such cars *between points within the state of Wisconsin* during the preceding calendar year, which statement shall be verified by such owner, or by some officer or agent having official knowledge of the facts.

" Sec. 3. Every such owner shall, on returning the statement provided for by section two of this act, apply to the state treasurer for a license to use the said cars upon the railways operated in this state, and to charge or collect fare or compensation for the use thereof, and shall pay to the state treasurer for such license the fee provided in the next section, and upon such payment the state treasurer shall issue to such owner a license to use such cars and charge fare or compensation for such use as aforesaid.

" Sec. 4. The annual license fee to be paid by such owner, as aforesaid, shall be two per centum of the earnings reported, as required by section two hereof; the amount of such license fee to be computed by the railroad commissioner, and by him certified to the state treasurer."

The first section, which attempts to prohibit the use of sleeping cars, etc., not owned by railway companies operating railways within this state, uses this language: "No owners . . . shall have a right to use, or charge or collect fare or compensation for the use of, any such car within the state," etc.[1] The part of this language which prohibits such company from making "a charge or collecting fare or compensation for the use of any such car within this state," can only be effective to prevent such charge to be made or fare collected within the state; as the legislature can have no power to make it unlawful to collect such fare or make such charge outside of the state, by a person or corporation not residing or being at the time within the state. The connecting of these prohibitions against collecting fare or compensation with the other prohibition as to use, would be some reason for holding that the use was prohibited only to the extent that the legislature prohibited the other acts, viz., to a use wholly within the state.

We do not, however, place any stress upon the language of the first section as limiting the scope of the statute to a use wholly within the state, but allude to it for the purpose of showing that the language of the first section is not inconsistent with the limitation which we think is clearly indicated in the second section, which requires the company or person owning the cars to make a return of the gross earnings made by the use of such cars, for the purpose of determining what sum shall be paid to the state for such right of use within the state. The section requires such owner to make "a true statement of the gross earnings

[1] Section 1 of the act, in full, is as follows: "No owners, whether corporate or otherwise, of palace cars, drawing-room cars, or sleeping cars, except railway companies operating railways within this state, shall have a right to use, or charge or collect fare or compensation for the use of, any such car within this state, until such owner shall have procured from the state treasurer a license to use such cars within this state as hereinafter provided."— REP.

made by the use of such cars between points within the state of Wisconsin during," etc.

In giving construction to this act we must take into account the fact that the legislature, when it enacted this law, knew that the greater share of the gross earnings of the car companies, for the use of their cars in this state, was not derived from their use " between points within this state," but that the greater share of such gross earnings were received by the companies for their use either in crossing this state, or some portion thereof, to and from points in other states, and from points outside of the state to points within, or from points within to points outside of the state. If it was the intention of the legislature to require the companies to make a report of the proportion of the gross earnings of their cars for their use in crossing the state from a point in one state to a point in another state, or in coming from a point outside of the state to a point within, or from a point within to a point outside of the state, why did they limit the report of gross earnings by the use of such cars *between points within the state?* The words "between points within the state" are not apt words to describe the crossing of the state from an adjoining state on one side into an adjoining state on another side; nor does it aptly describe the act of going from a point within the state to a point outside thereof, nor from a point outside to a point within the state. The language here used is not the general language used in regard to the reports required to be made by railroad companies of their gross earnings for the like purpose of license, and which language has received a well-known practical construction.

The law in regard to the railroads requires the companies to make " a true statement of the gross earnings of their respective roads for the preceding calendar year." This language has received a construction, acquiesced in by both the state and the companies, that, in making their state-

ment of gross earnings, it means, as regards passengers and freight carried across the state, or from points outside to points within the state, or *vice versa*, such proportion of such earnings as the carriage in the state bears to the whole carriage without and within. Had the language of the statute of 1883 been as general as that above quoted as to railroads, or had it declared that they should make a return of the gross earnings of their cars in the state, we would have felt constrained to give these general words the meaning which had been given to them as used in the law in regard to railroads. There certainly appears to have been an intent on the part of the legislature to limit the return of the gross earnings of the car companies, not to earnings for carriage in the state, but to such earnings as are derived from their carriage " between points within the state," and to no other earnings. If they had intended to include any other, why use the restrictive words?

It is said that it would be absurd that the legislature should have so restricted the gross earnings to be reported as a basis for fixing the license to be given to the companies, when they well knew that such gross earnings were but a mere fraction of their earnings in carrying passengers into, out of, and across the state, and that it is to be presumed it was these larger earnings that were intended to be reached. To this there are at least two sufficient answers: (1) The language used does not include such larger earnings except by giving it a most liberal construction in favor of the state, which, as we shall show, is not permissible in acts of this character; and (2) there is at least a very grave question as to the power of the legislature to impose a license upon persons or car companies upon the basis of their earnings in transporting passengers into, out of, and across the state, under the provisions of the constitution of the United States above quoted, in all cases where the persons or companies using such cars are not residents of the

state and have no taxable property within the state. We must presume the doubtful character of such a law was known to the legislature, and that, as cautious and prudent legislators, they chose to place their action upon grounds which could not be questioned.

The learned counsel for the defendants cited the following authorities in support of the rule that laws which impose restrictions upon trade, or which lay a tax or excise, cannot receive a liberal construction in favor of the state. Dwar. St. 742; *Denn v. Diamond*, 4 Barn. & C. 244; *Tomkins v. Ashby*, 6 Barn. & C. 543; *Doe dem. Scruton v. Snaith*, 8 Bing. 152; *Gurr v. Scudds*, 11 Exch. 192; *Sewall v. Jones*, 9 Pick. 414; *U. S. v. Watts*, 1 Bond, 583; *Powers v. Barney*, 5 Blatchf. 203; *U. S. v. Wigglesworth*, 2 Story, 373.

A brief statement of what was decided in some of the cases above cited will show the strictness of construction which the courts have applied to laws of this kind.

In *U. S. v. Watts*, the court construed a statute which provided "that any person or person having in charge or trust as administrator, executor, or trustee, of any legacies or distributive shares arising from personal property of any kind whatsoever, when the whole amount of such personal property as aforesaid shall exceed the sum of one thousand dollars in actual value, shall be subject to a tax or duty on such legacies or distributive shares," at certain specified rates. Watts, as executor of one Mrs. Hoard, deceased, had in his hands a large amount of money which he had received from the sale of real estate of the deceased, under a power of sale given to him by her will, and which, by the terms of said will, he was required to pay over to certain legatees mentioned in the will. The court held that the money in his hands derived from the sales of the real estate of the deceased, and which he was directed to pay over in cash to the legatees, was not subject to the tax or duty mentioned in the statute. The court, in deciding this case, say

that they "cannot apply the equitable rule which is often applied in order to carry out the intent of a testator, and treat that as personal property which the testator directs to be sold and converted into personalty;" and they further say: "It is the duty of courts of the Union, undoubtedly, so far as they are invested with any agency in carrying out the financial purposes of the government, fairly to enforce the revenue laws of the country, and see that they are not fraudulently evaded. But they are not at liberty, by construction or legal fiction, to enlarge their scope to include subjects of taxation not within the terms of the law. It belongs exclusively to the legislative department of the government to define and declare upon what subjects taxes shall be imposed, and to provide the agencies by which they shall be assessed and collected; and, however expedient it may seem under certain circumstances to invade the proper domain of legislation by judicial construction, it is clearly in conflict with the theory of the government."

In *Powers v. Barney*, 5 Blatchf. 203, Justice NELSON, in construing a statute of the United States which in one section declared that "Bark Peruvian" should pay an *ad valorem* duty of ten per cent., and in another section of the same act said it should be exempted from all duty, says: "Another principle may also be invoked, which is that in cases of serious ambiguity in the language of the act, or doubtful classification of articles, the construction is to be in favor of the importer, as duties are never imposed upon the citizen upon vague or doubtful interpretations."

In *Tomkins v. Ashby*, 6 Barn. & C. 543, it was held that the following memorandum was not a receipt which required a stamp under the laws of England: "September 25, 1824. Mr. Tomkins has left in my hands £200. [Signed by Ashby.]" The statute imposed a stamp duty upon "every receipt or discharge given for or upon the payment of money," and there was a further declaration in the law that "any

note or memorandum given to any person upon payment of money, whereby any sum of money, debt, or demand, or any part of any debt or demand, therein specified, and amounting to £2 and upward, shall be acknowledged to have been paid, settled, balanced, or otherwise discharged, shall be deemed a receipt." The court held that the act related wholly to receipts given in discharge of something formerly due, and not to the receipt of money to be held for another. In construing this act, Lord TENTERDEN, C. J., says: "Acts of parliament imposing duties are so to be construed as not to make any instruments liable to them, *unless manifestly* within the intention of the legislature."

In *U. S. v. Wigglesworth,* 2 Story, 373, the question was whether, under an act of Congress of 1841, a permanent duty had been charged upon indigo, or whether it had become an exempted article under the act of 1833, which had imposed a duty of fifteen per cent. *ad valorem* until June 30, 1842. The act of 1841, ch. 24, provided "that, upon all articles imported into the United States after the thirtieth of September, 1841, there should be laid, collected, and paid on all articles which are now free of duty, or which are chargeable with a duty of less than twenty per cent. *ad valorem,* a duty of twenty per cent. *ad valorem,* except on the following enumerated articles (among which indigo is enumerated), which shall pay respectively the same rates of duties imposed on them under existing laws." In giving construction to these laws, the court held that indigo became a free article of import after the 30th of June, 1842, notwithstanding the act of 1841; and Justice STORY gives the following reason for giving the law such construction: "My reasons for this conclusion are these: In the first place, it is, as I conceive, a general rule, in the interpretation of all statutes levying taxes or duties upon subjects or citizens, not to extend their provisions by implication beyond the clear import of the language used, or to enlarge their operations

so as to embrace matters not specifically pointed out, although standing upon a close analogy. In every case, therefore, of doubt, such statutes are construed most strongly against the government, and in favor of the subjects or citizens; because burdens are not to be imposed, nor presumed to be imposed, beyond what the statutes expressly and clearly import. Revenue statutes are, in no just sense, remedial laws, or laws founded on any permanent public policy, and therefore are not to be liberally construed. Hence, in the present case, if it be a matter of real doubt whether the intention of the act of 1841 was to levy a permanent duty on indigo, that doubt will absolve the importer from paying the duty beyond the period when it would otherwise be free."

In *Sewall v. Jones*, 9 Pick. 414, PARKER, C. J., in construing the state law which provided that "all real and personal estate which shall at any time be exposed for sale at public auction or vendue should be subject to pay certain duties," and holding that the act did not apply to a case where an auctioneer let real estate belonging to a bank, at public auction, to the person who would pay the highest annual rent for the term of five years, says: "If an existing lease were sold by auction, the tax might be due within the terms of the act, for in that case estate, real or personal, would be sold. But here there is nothing sold by auction, the estate not existing which it was the object of the sale to fix a price for. This may be thought a close construction of the statute, but we are to suppose that the legislature intended nothing beyond what their fair, legal construction will indicate. If the terms of these enactments have not embraced their object, the power is with them, by explanatory or additional acts, to extend them."

The rule of construction as laid down in the cases cited by the counsel for the defendants is not disputed by the attorney general. But it is argued that because the general language used in regard to railroads making report, as

above quoted, has been construed by all parties interested to include all earnings made by the use of such roads in the state, the law in question should receive the same construction. The difficulty in giving it the same construction as has been given to the law in regard to railroad companies, lies in the fact that the language used in this law is not general, but restrictive; and to give it the same construction as is given to the act using only general words, would violate that rule for the construction of statutes which requires the courts to give effect if possible to every clause, sentence, or word used, and not to so construe it as to render such clause, sentence, or word superfluous or insignificant. *Harrington v. Smith*, 28 Wis. 43–67; *James v. DuBois*, 16 N. J. Law, 285, 293; *Hutchen v. Niblo*, 4 Blackf. 148; *Opinion of Justices*, 22 Pick. 571; *Opinions of Justices*, 7 Mass. 523; *Green v. Cheek*, 5 Ind. 105. To give the act the construction contended for by the attorney general, we must strike out altogether the words "between points within the state," or treat the same as of no significance and without meaning. This would be contrary to the rules of construction above stated. The very fact that words were inserted in the statute different from those used in the statute in regard to railroads, is a persuasive argument that the legislature intended the statute should have a different meaning. Unless the words added or changed are simply synonyms of those used in the existing statute upon a similar subject, it cannot be fairly claimed that the legislature intended the two statutes should have the same construction. We think, upon the face of the statute, the car company was only required to make the return it has done, and the state has nothing to complain of.

But, to our minds, there is another reason which is quite conclusive as to the intent of the legislature to restrict the return of gross earnings to such as the company received from the use of its cars in carrying passengers between

points wholly within this state; and that reason is found in the history of the passage of the act itself. The legislative journals of the senate and assembly for 1883 show that two bills were introduced into the legislature relating to the subject of requiring the owners of sleeping, parlor, and drawing-room cars to obtain a license from the state, in order to be entitled lawfully to use the same in this state, except where such cars were owned by railroad companies operated in this state. The one was bill No. 65, senate, which, after undergoing radical amendments, was finally passed and became ch. 353, Laws of 1883; the other was assembly bill No. 89, which was indefinitely postponed. The assembly bill, upon the question of the returns to be made of the earnings, reads as follows: "The gross amount of all its receipts and earnings within or without this state for the calendar year next preceding the making of said report; and in computing such gross receipts and earnings the same shall be in the proportion that the distance traversed by the cars of such company in this state bears to the whole distance such cars are run. And at the time of making said report such company shall pay into the treasury of this state the sum of two dollars on every one hundred dollars of such receipts or earnings in this state, according to such computation." The original senate bill No. 65, when introduced into the senate, read as follows:

"Sec. 1. No railroad company whose line of railroad lies in part or is wholly within the state, shall transport or allow to be transported, over any of its lines of road, any palace cars, drawing-room cars, or sleeping cars not owned by such railroad company, until the owner or owners of such cars shall have procured a license from the state treasurer, as hereinafter provided.

"Sec. 2. The owner or owners of any such cars mentioned in section one of this act, other than a railroad company whose line of road lies in part or wholly within the state,

desiring to have their cars transported over any of the lines of railroad within the state, shall, on or before the tenth day of February in each year, make and return to the railroad commissioner a true statement of *the gross earnings of such cars upon the railroads within this state* during the preceding calendar year, which statement shall be verified by the person having official knowledge of the facts."

[Section 3 has no bearing upon the construction of the present law.]

" Sec. 4. The annual license fee to be paid by the owners of such cars shall be four per centum of *the gross earnings of such cars within this state* during the preceding calendar year, as shown by the provisions of section two of this act; the amount of such license to be computed by the railroad commissioner, and by him certified to the state treasurer.

" Sec. 5. The owner or owners of the cars mentioned and described in this act shall make reports to the railroad commissioner according to section 1795 of the Revised Statutes, and such other reports as he may require, and all laws relating to railroads shall, as far as applicable, be taken to apply to the owner of such cars."

This original bill was referred to the railroad committee of the senate, and by way of amendment a bill in the language now found in ch. 353, Laws of 1883, was reported as a substitute for said bill 65, senate. The substitute was adopted and became a law.

The rejection of the assembly bill, which in express terms provided that the gross earnings of the car companies within the state should be computed in proportion to the distance traversed by the cars of the company in this state, to the whole distance traversed by such cars, and the amendment of the senate bill so as to confine such gross earnings to be reported, to earnings *made by the use of such cars between points within the state*, instead of such gross earnings in the state, clearly indicate an intent on the part of the legisla-

ture to restrict the gross earnings to be reported as a basis for computing the license fee to such earnings, and such only, as were received by carrying passengers between points situate within the state. Had the legislature enacted the senate bill in the language used when it was introduced, there would have been good reason for holding that it should have received the practical construction given to the railroad law upon the same subject; but its amendment, by inserting the words " between points," renders it certain that the law should not receive the construction given to the railroad act on the same subject, and that the legislature did not mean that it should have such construction.

CASSODAY, J. I am compelled to disagree with my brethren as to the construction of ch. 353, Laws of 1883. By their construction, as I understand it, such " palace cars," etc., may be used by such owners (not excepted) within the state without paying any license fee whatever, provided only that such use is confined entirely to inter-state passengers. This seems to me to be in direct conflict with the first and sixth sections of the act, which are sweeping, and absolutely take away from such owners any and all " right to *use*, or charge or collect fare or compensation *for the use* of, *any* such cars *within* this state, until such owner shall have procured from the state treasurer a license *to use* such cars *within* this state;" and in case of any neglect or refusal to make the requisite report, or pay the requisite license, then " any such use by any such owner, in violation of the provisions of this act, may be restrained by injunction at the suit of the attorney general, in any court of competent jurisdiction."

To my mind, " a true statement of the gross earnings made by the *use of such cars* between points within the state of Wisconsin during the preceding calendar year," as required by section 2 of the act, covers and includes all such

earnings made by such use between such points, and hence necessarily includes inter-state passengers, just as fully and completely as though it had said, all such earnings made by such use during such year within the state, between the lines of the state, and between all intermediate points within the state, or simply the gross earnings of the use of such cars within the state during such year. This construction has additional sanction from the fifth section, which declares that such "statement," or "the report required, . . . shall be in such form and shall embrace such details as shall be prescribed by the railroad commissioner." It seems to me that there is nothing in the language of the act, or its history, authorizing the exclusion from the requisite "statement" of *any* " of the gross earnings made by the use of such cars between points within the state" during such year, much less the exclusion of all or nearly all of them. "The annual license fee to be paid by such owner" is definitely fixed by the fourth section of the act. It "shall be two per centum of the earnings reported, as required by section two" of the act; and the "amount of such license fee " is "to be computed by the railroad commissioner, and by him certified to the state treasurer." The two per centum is to be upon the entire amount of such gross earnings made by such use within the state during such year. I find nothing in the act, nor its history, which to my mind limits, or which authorizes a construction which would limit, such per centum to a mere fraction of such gross earnings; much less, none at all, or a very small fraction thereof.

The conclusion reached by the majority of the court renders it unnecessary to consider the important question, whether the act is constitutional, and hence I unite with them in reserving that question for future consideration.

*By the Court.*— The application of the state for an injunction is denied.

Upon a motion for a rehearing it was argued, *inter alia*, on behalf of the state, that the construction put upon the statute by the plaintiff is the only one which the words, interpreted in their ordinary sense, will bear. The language is explicit and, in fact, leaves no room for construction. *Love v. Hinckley*, 1 Abbott, Adm. 442; 13 Opinions of Attorney Generals, 513; *Doe v. Considine*, 6 Wall. 458; *U. S. v. Warner*, 4 McLean, 468; *Binns v. Lawrence*, 12 How. 17; *Denn v. Reid*, 10 Pet. 527. The object of the statute is revenue, and the legislature, knowing that the great part of the earnings of the company were derived from inter-state business, could not have intended to cover by the act only the small domestic earnings. As construed by the court the law brings into the treasury only the paltry sum of $240 a year — a sum not sufficient to pay for its passage and publication. As a tax law the statute should not be strictly construed. *M. & St. P. R. Co. v. Crawford Co.* 29 Wis. 116; *M. & St. P. R. Co. v. Milwaukee*, 34 id. 277; *Cornwell v. Todd*, 38 Conn. 443-7; *U. S. v. 3 Tons of Coal*, 6 Biss. 379; *U. S. v. Breed*, 1 Sumner, 159; *Taylor v. U. S.* 3 How. 197; *U. S. v. 100 Barrels of Spirits*, 2 Abb. C. C. 305-314; *Cliquot's Champagne*, 3 Wall. 114, 145; *U. S. v. 36 Barrels of High Wines*, 7 Blatchf. 459; *U. S. v. Mynderse*, id. 485; *U. S. v. 25 Cases of Cloth*, Crabbe, 356; *U. S. v. Olney*, 1 Abb. C. C. 275; *28 Cases, etc.*, 2 Benedict, 63; *U. S. v. Hodson*, 10 Wall. 395. Even in penal statutes the ordinary fair meaning of the words cannot be restricted. *The Schooner Harriet*, 1 Story, C. C. 256; *U. S. v. Wilson*, 1 Baldwin, 78; *Pike v. Jenkins*, 12 N. H. 255; *Huffman v. State*, 29 Ala. 40. There is nothing in the history of the act in question which militates against the construction contended for by the state. There being no ambiguity in the language, this is not a case in which reference can be had to the legislative journals. It may be doubtful, indeed, whether in any case the courts may look to the various

stages in the passage of an act, to determine its construction. *U. S. v. U. P. R. Co.* 91 U. S. 72; *Dist. of Columbia v. Washington Market Co.* 3 MacArthur, 559, 571. A difference between the wording of this act and that of the general railroad act should not be taken to indicate a different intent. Sedgwick on Const. & Stat. Law, 197, and cases cited. See, also, as to the construction of the statute: *Water Comm'rs v. Brewster*, 42 N. J. Law, 125, 129; *Hyatt v. Taylor*, 42 N. Y. 258, 262; *Woolsey v. Cade*, 54 Ala. 378, 388; *The Abbotsford*, 98 U. S. 440; *Weston v. Shawano Co.* 44 Wis. 242; Cooley on Taxation, 54; *Jones Mfg. Co. v. Comm.* 69 Pa. St. 137.

Counsel also argued at length the constitutionality of the statute if construed as claimed by the state.

The motion was denied October 13, 1885.